# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

v.

AARON RUCKER,

Defendant.

**DECISION AND ORDER
& REPORT AND
RECOMMENDATION**
15-CR-6079 (FPG)

## Procedural Background

On May 26, 2015, defendant Aaron Rucker (hereinafter "Rucker" or "defendant") was indicted by the Federal Grand Jury with Attempted Hobbs Act Robbery (Count I) and Use of a Firearm During and in Relation to a Crime of Violence (Count II). See Docket # 1. On May 28, 2015, this Court signed a warrant for Rucker's arrest. The warrant authorized federal law enforcement officers to search Rucker's home at 784 Hudson Avenue, Rochester, New York, for the purpose of arresting Rucker. See Gov't Ex. 8 for Suppression Hearing, April 5, 2017. The warrant was executed on May 29, 2015 at approximately 6:10 a.m., and Rucker was taken into custody. Id. Rucker was appointed CJA counsel Scott Green, Esq., and on June 4, 2015 the Court entered an Order of Pretrial Detention finding a serious risk that the defendant would endanger the safety of another person or the community. See Docket # 5. On July 21, 2015, defendant was charged by Superseding Indictment ("the Indictment") with Hobbs Act Conspiracy (Count I), two counts of Attempted Hobbs Act Robbery (Counts II and III), and Use of a

Firearm During and in Relation to a Crime of Violence (Count IV).
Docket # 8.

At a status of counsel conference held on November 17, 2015,
defense counsel confirmed that differences between him and his
client were irreconcilable, the Court appointed CJA counsel Peter
Pullano, Esq. to represent defendant. Counsel filed various
omnibus motions on February 2, 2016 (Docket # 30), and the
government responded on February 22, 2016 (Docket # 35). The Court
granted defendant's request to file supplemental motions, which he
did on April 28, 2016. Docket # 49. The government responded on
May 9, 2016. Docket # 53. The Court held a hearing on the motions
on May 13, 2017, resolving many of the motions on the record.
Docket ## 54-55. The Court reserved decision on defendant's
motions (1) to dismiss the indictment; (2) for a bill of
particulars; (3) to suppress statements; and (4) to suppress
physical evidence. Id. Defendant thereafter filed further
supplemental briefing on September 1, 2016 (Docket # 68), and the
government responded on September 23, 2016 (Docket # 72). The
Court held another hearing on October 27, 2016 and reserved
decision on defendant's motions to (1) dismiss the indictment; (2)
all motions relating to the grand jury proceedings. See Docket ##
73-74. All of these motions are now before the Court.

In a letter to the Court received on July 25, 2017 and at a
subsequent status of counsel conference held on August 1, 2016,

defendant requested that the Court assign him new counsel. The Court denied this request. See Docket # 65. Defendant renewed his request for new counsel, and at a subsequent status of counsel conference held on November 18, 2016, expressed his desire to appear in this matter pro se. Docket # 75. The Court held a lengthy colloquy, alerting defendant to the perils of self-representation and ensuring that defendant's choice to proceed pro se was made knowingly and voluntarily. Following the inquiry, the Court terminated Mr. Pullano from representation. Id. The Court then conducted an evidentiary hearing related to defendant's motion to suppress statements. Docket ## 75, 78. The government filed a post-hearing brief on January 31, 2017. Docket # 83. Following the evidentiary hearing, Rucker requested to be appointed standby counsel to assist with legal research and motions filing, which the Court granted over the government's objection. See Docket ## 81, 84. The Court appointed Bryan Oathout, Esq. as stand by counsel on January 31, 2017. Following another conference with all parties on March 17, 2017, defendant requested that the Court appoint Mr. Oathout as counsel, which the Court did on April 5, 2017. Docket ## 91, 96.

The Court held an evidentiary hearing on defendant's motion to suppress physical evidence on April 5, 2017. Docket ## 96, 97. On June 19, 2017, Defendant submitted post-hearing briefs on both motions to suppress evidence and statements (Docket ## 99, 100).

On July 17, 2017, the government filed a motion to reopen the suppression hearing record regarding suppression of physical evidence. Docket # 104. The government thereafter filed a post-hearing brief on the suppression of physical evidence. Docket # 107. Defendant filed a response in opposition to the government's motion to reopen the record on August 7, 2017 (Docket # 108), and the government replied on August 15, 2017 (Docket # 109). On September 18, 2017, the Court held a hearing on the motion to reopen, and reserved decision. Docket # 112. The Court will now address all pending motions.[1]

## A. Motions to Dismiss the Indictment

1. Interstate Commerce Nexus: All four counts of the Indictment relate to Rucker's alleged participation in two "home invasion" robberies occurring on October 8, 2014 and November 4, 2014. Count I alleges that Rucker conspired with others "to obstruct, delay and affect commerce" and the "movement of articles and commodities in commerce" by robbing money and drugs from individuals "engaged in the unlawful distribution and possession of controlled substances, including heroin and marijuana" in violation of 18 U.S.C. § 1951(a), commonly referred to as the Hobbs Act. Count II alleges that the October 8 attempted robbery violated the Hobbs Act, and Count III alleges that the November 4

---

[1] By Order of Hon. Frank P. Geraci, United States District Judge, dated October 9, 2015, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). See Docket # 2.

4

attempted robbery violated the Hobbs Act. Count IV alleges that Rucker knowingly and unlawfully used, carried, and brandished a handgun during the November 4 robbery "in furtherance" of "a crime of violence" – the attempted Hobbs Act robbery and conspiracy. See Indictment (Docket # 8).

The common denominator in all four counts is a violation of the Hobbs Act, which, in turn, requires that the charged robbery be one that "affects" interstate commerce. Rucker argues that this nexus to interstate commerce is lacking in the charging documents. Unfortunately for Rucker – and as addressed by this Court with regard to Rucker's co-defendant who made this same argument[2] – the Court is not writing on a "clean slate" and, as interesting as Rucker's arguments may be in a discussion of the limits of Congress's commerce clause power, his contentions are inconsistent with established Second Circuit and Supreme Court precedents – at least at this particular juncture of the prosecution.

As a general matter, it is settled that Congress has the power to control purely local drug distribution activities because such local activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Gonzales

---

[2] See United States v. McGee, No. 15-CR-6079 (JWF), 2017 WL 667199, at *1-2 (W.D.N.Y. Feb. 17, 2017), report and recommendation adopted, No. 15-CR-6079-FPG, 2017 WL 2880121 (W.D.N.Y. July 6, 2017) (denying defendant's motion to dismiss the Indictment for failure to allege a nexus to interstate commerce).

v. Raich, 545 U.S. 1, 17 (2005). In Taylor v. United States, __ U.S. __, 136 S.Ct. 2074 (2016), the Supreme Court addressed the contours of the interstate commerce requirement found in the Hobbs Act. The plaintiff in Taylor was charged with two home invasions of drug dealers, seeking to rob them of drugs and drug proceeds. 136 S.Ct. at 2079. The plaintiff argued that the government failed to satisfy the interstate commerce element of the Hobbs Act because it had not proven that the drugs subject to the robbery "originated or were destined for sale out of State," or that the victim drug dealers "operated an interstate business." Id. at 2080. Relying on its 2005 holding in Gonzales v. Raich, the Supreme Court rejected the plaintiff's Commerce Clause arguments. The Court explained that its holding was simply a logical extension of Raich:

> The case now before us requires no more than that we graft our holding in Raich onto the commerce element of the Hobbs Act. The Hobbs Act criminalizes robberies affecting "commerce over which the United States has jurisdiction." § 1951(b)(3). Under Raich, the market for marijuana, including its intrastate aspects, is "commerce over which the United States has jurisdiction." It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction.

Id. Thus, when a robber tries to steal drugs from a drug dealer, "proof of such an attempt in itself supports the conclusion that the robber attempted to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act." United States v. Lee, 834 F.3d 145, 152 (2d Cir. 2016).

6

The foregoing is not to say that the defendant's arguments here are irrelevant, but they are certainly premature. The Court in Taylor explained that its holding "does not make the commerce provision of the Hobbs Act superfluous." 136 S.Ct. at 2081. Indeed, there may be Hobbs Act trials where the conduct proven, "even in the aggregate, may not substantially affect commerce." Id. at 2081. But the Court also made clear that the nature of the proof needed to satisfy the commerce element focuses not on the specific interstate actions of the defendant, but on the nature of the defendant's activities. "[W]here the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." Id. In alleging that the defendant targeted money, heroin and marijuana, the Indictment here sufficiently alleges a nexus to interstate commerce.

2. Requisite Mens Rea: Defendant also moves to dismiss Counts I, II and III of the Indictment for failure to "allege the requisite mens rea." See Docket # 68 at 3-4. In response, the government acknowledges that criminal intent must be alleged either explicitly or implicitly in a Hobbs Act charge, but argues that the Indictment is sufficient because it conveys the required mens rea element through the use of the term "robbery" which,

7

according to the government, has been held to imply knowing and willful conduct. See Gov't Response (Docket # 53) at 9; Docket # 72 at 2.

Under Second Circuit precedent, the government's position is correct. The Indictment is sufficient to assert the mens rea element of robbery even though it does not contain the words "knowingly" or "willfully." The Indictment specifically references "robbery" and its statutory definition, and thereby imputes the necessary mens rea therein.[3] Courts in this circuit have held that the statutory definition of "robbery" in 18 U.S.C. § 1951(b)(1) implies "knowing" and "willful" conduct, and an Indictment is sufficient even if it does not explicitly reference those terms. See, e.g., United States v. Jackson, 513 F. App'x 51, 55 (2d Cir. 2013), cert. denied, 133 S.Ct. 1848 (2013) (holding that "[a]lthough the indictment did not specifically contain the words 'knowingly' or 'willfully,' the plain and common-sense reading of the indictment put the defendant on notice of what the charges against him were, such that he was not prejudiced in the preparation of his defense."); United States v. Tobias, 33 F. App'x 547, 549 (2d Cir. 2002), cert. denied, 538 U.S. 933 (2003) ("The indictment tracked the language of 18 U.S.C. § 1951, using the

---

[3] "The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

8

term 'robbery,' which necessarily implies knowing and willful conduct."); United States v. McGee, No. 15-CR-6079 (JWF), 2017 WL 667199, at *2 (W.D.N.Y. Feb. 17, 2017), report and recommendation adopted, No. 15-CR-6079-FPG, 2017 WL 2880121 (W.D.N.Y. July 6, 2017) (holding that an indictment was "sufficient to assert the mens rea element of robbery even though it does not contain the words 'knowingly' or 'willfully.'"); United States v. McCoy, 14-CR-6181 EAW, 2016 WL 6952351, at *3-5 (W.D.N.Y. Nov. 28, 2016) ("[T]he grand jury in this case plainly determined that there was probable cause to believe that Defendants committed a Hobbs Act robbery . . . . Under settled Second Circuit precedent, this is plainly sufficient to allege the mens rea element of "knowingly" and "willfully" for a Hobbs Act violation").

3. Sufficient Factual Allegations: Counts II and III of the Superseding Indictment charge defendant with attempted Hobbs Act robbery on October 8, 2014 and November 4, 2014, respectively. See Docket # 8. Defendant moves to dismiss these counts, stating that they do not contain sufficient factual allegations to support such charges. See Docket # 68 at 4-8. Defendant specifically argues that the facts, as stated by the government, show that at least one of the counts relates to a robbery that was allegedly completed, and therefore cannot support a charge of "attempt." Id. at 6. The government, by Notice dated March 20, 2017, provided particularization regarding Counts II and III, explaining that

9

With respect to Count 2, the government will present
testimony that the robbery was not completed. The
residence was targeted by the defendants and an
accomplice in order to rob a drug dealer of drugs and
drug proceeds. The attempt made to enter the residence
was unsuccessful.

With respect to Count 3, the government will present
testimony that the robbery was completed. The residence
was targeted by the defendants and an accomplice in order
to rob a drug dealer of drugs, in particular heroin and
marijuana, and drug proceeds. While the drug dealer was
not present, forced entry was made past a female occupant
of the residents and there will be evidence that drugs
and/or money was taken.

Docket # 93. The government submits that attempt is a lesser

included offense within the Hobbs Act crime of robbery, and that

the evidence presented to the grand jury satisfies a conviction of

attempted Hobbs Act robbery. See Docket # 72 at 4.

It is a commonly understood aspect of our criminal system

that a defendant may be found guilty of a "lesser offense" than

that which is charged. See United States v. Marin, 513 F.2d 974,

976 (2d Cir. 1975) ("Under Fed. R. Crim. P. 31(c), a defendant may

be found guilty of an attempt to commit a substantive offense,

whether or not the attempt was charged in the indictment, provided

an attempt is punishable."); see also Fed. R. Crim. P. 31(c). An

"attempt" is considered a lesser included offense of a Hobbs Act

Robbery. United States v. Gregory, No. 99-1765, 2000 WL 1644071

(2d Cir. Nov. 1, 2000), at *2 ("It is clearly established that

attempt is a lesser included offense within the Hobbs Act crime of

robbery."); see also 18 U.S.C. § 1951 (Hobbs Act statute including

10

attempt); Fed. R. Crim. P. 31(c). Here, the defendant makes the unusual argument that he was "under-charged" – i.e., that he was wrongfully charged with the lesser-included offense, attempt, when he should have been charged with a completed Hobbs Act Robbery.[4] This argument gives the Court pause, but not for long. If the government states that it has provided evidence sufficient to indict defendant for a completed Hobbs Act robbery, it has, by nature, established evidence to support an indictment for an attempted Hobbs Act robbery. There is no merit to plaintiff's argument here. See Ljutica v. Holder, 588 F.3d 119, 125 (2d Cir. 2009) ("Because an attempt to commit a substantive crime is a lesser included offense of that substantive crime, the facts that support a conviction for the completed crime also support a conviction for attempt.").

As for the sufficiency of the Indictment, the law is well settled in this area. Under the test established the Supreme Court in 1974 in Hamling v. United States, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or

---

[4] Insofar as defendant argues that an attempted Hobbs Act robbery is not a lesser included offense because it does not satisfy the interstate commerce nexus necessary under the statute, that argument is summarily denied as well. See United States v. Lee, 834 F.3d 145 (2d Cir. 2016) (when a robber tries to steal drugs from a drug dealer, "proof of such an attempt in itself supports the conclusion that the robber attempted to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act").

conviction in bar of future prosecutions for the same offense."
418 U.S. 87, 117 (1974). To satisfy the pleading requirements,
"an indictment need 'do little more than to track the language of
the statute charged and state the time and place (in approximate
terms) of the alleged crime.'" United States v. Stringer, 730
F.3d 120, 124 (2d Cir. 2013) (quoting United States v. Pirro, 212
F.3d 86, 91 (2d Cir. 2000)). When charges in an indictment state
the elements and date of the offense to reasonably inform the
defendant, courts in this circuit have "repeatedly refused, in the
absence of any showing of prejudice, to dismiss charges for lack
of specificity." United States v. Walsh, 194 F.3d 37, 45 (2d Cir.
1999) (quoting United States v. McClean, 528 F.2d 1250, 1257 (2d
Cir.1976)). Courts have allowed conclusory pleadings for charges
of Hobbs Act violations in specific acknowledgment that a
discussion of the charged conduct's effect on interstate commerce
would contribute "virtually nothing" to a defendant's
understanding of the nature of the charged offenses. See United
States v. Diecidue, 603 F.2d 535, 547-48 (5th Cir. 1979) (holding
that an indictment that alleged interstate commerce effects in
conclusory terms was not fatally insufficient); see also United
States v. Nachef, No. 97-10141-MEL, 1998 WL 151270, at *3 (D. Mass.
March 20, 1998) ("Factual detail on the interstate commerce nexus
is simply not required for a Hobbs Act indictment to meet the
Hamling test."). A review of the Indictment satisfies the pleading

12

requirements under Hamling.

4. Use of Firearm During a Crime of Violence: Count IV of the Indictment charges defendant with use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (2). Defendant moves to dismiss this Count on the basis that (1) because he "challenges the sufficiency of the indictment and moves to dismiss counts 1 and 3 as defective, if the relief sought is granted Count 4 must also be dismissed"; and (2) he cannot be charged with using a firearm during a crime of violence because the underlying crimes — here, attempted Hobbs Act robbery and conspiracy to commit Hobbs Act robbery — are not crimes of violence. Docket # 68 at 8-9. In light of the Court's Recommendation that substantive Counts I-III have been properly pled, the Court will move directly to defendant's second argument, which is made in reliance on the Supreme Court's holding in Johnson v. United States ("Johnson II"), ___ U.S. ___, 135 S.Ct. 2551 (2015).

Count IV of the Superseding Indictment charges the defendant with violating 18 U.S.C. §§ 924(c)(1)(A)(ii) and (2), which provides in pertinent part:

[A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime –

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years.

13

18 U.S.C. § 924(c)(1)(A) (emphasis added). The definition of "crime of violence" is critical to this offense, and 18 U.S.C. § 924(c)(3) sets forth two alternative definitions:

> For the purposes of this subsection the term "crime of violence" means an offense that is a felony and-
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subsection (A) is referred to as the "force clause" and subsection (B) the "risk-of-force-clause." See United States v. Hill, 832 F.3d 135, 138 (2d Cir. 2016). In Hill, the Second Circuit conclusively determined that Hobbs Act robbery constitutes a crime of violence under both the "force clause" and the "risk-of-force clause." Id. at 137. The court was unpersuaded by Hill's argument, repeated here by Rucker, that in light of Johnson II, the "risk-of-force-clause" is unconstitutionally vague. See Hill, 832 F.3d at 145; see also Johnson II, 135 S.Ct. at 2563 (holding that the residual clause of 18 U.S.C. § 924(e)(2)(B)(ii), which uses language similar to § 924(c)(3)(B), is unconstitutionally vague).

Conspiracy and Attempt to Commit Hobbs Act Robbery: Having determined that Hobbs Act robbery itself constitutes a crime of violence under both subsections of § 924(c)(3), the next issue

14

presented by Rucker is whether an attempt and a conspiracy to commit Hobbs Act robbery — Counts I-III of the Indictment — also constitute crimes of violence under the statute.

Prior to Johnson II, the Second Circuit held that Hobbs Act conspiracy is a crime of violence. United States v. Elder, 88 F.3d 127, 129 (2d Cir. 1996)("[A] Hobbs Act conspiracy to commit robbery is by definition a conspiracy that involves a substantial risk that physical force may be used against the person or property of another."); United States v. DiSomma, 951 F.2d 494, 496 (2d Cir. 1991) (finding conspiracy to commit Hobbs Act robbery a "crime of violence" under the Bail Reform Act, which employs the same definition as § 924(c)(3)).    In Hill, because the case did not involve a conspiracy charge, the Second Circuit did not need to clarify whether that classification remains in light of Johnson II.   District courts in the circuit that have considered the issue, however, agree that conspiracy to commit Hobbs Act robbery is a crime of violence under § 924(c)(3).    See United States v. McCoy, 235 F. Supp. 3d 427, 434-45 (W.D.N.Y. 2017) (finding that Hobbs Act conspiracy is a crime of violence and collecting cases); United States v. Biba, 219 F. Supp. 3d 347, 353 (E.D.N.Y. 2016) (same). Furthermore, as noted by the district court in United States v. Biba, the Second Circuit has

> held that a conspiracy to commit a crime that has been
> recognized as a crime of violence is itself a crime of
> violence: "[A] conspiracy, by its very nature, is a
> collective criminal effort where a common goal unites

15

two or more criminals. Such a meeting of the minds enhances the likelihood that the planned crime will be carried out. Thus, when a conspiracy exists to commit a crime of violence . . . the conspiracy itself poses a substantial risk of violence, which qualifies it under Section 924(c)(1) and Section 924(c)(3)(B) as a crime of violence."

219 F. Supp. 3d at 354 (quoting United States v. Patino, 962 F.2d 263, 267 (2d Cir. 1992)). The Court concludes that a conspiracy to commit a Hobbs Act robbery is a crime of violence under 924(c).

Whether attempted Hobbs Act robbery qualifies as a crime of violence appears to be a case of first impression in this circuit post-Johnson II.[5] Having determined that the conspiracy charge, Count I of the Indictment, is a crime of violence, this Court need not today reach that question. The defendant is properly alleged to have committed a predicate crime of violence, and the Court finds no validity in the defendant's argument that Count IV of the indictment should be dismissed.

5. Selective Prosecution: Defendant contends that this prosecution violates his due process rights because an alleged co-conspirator was charged under state law in state court and faced a significantly lower penalty. See Docket # 49 at 46. According to the government, this co-conspirator was charged by the state prior to federal involvement. The government stated during oral

---

[5] Other courts have addressed this issue. See, e.g., Chatfield v. United States, No. 16-22591-CIV, 2017 WL 1066776, at *11 (S.D. Fla. Mar. 2, 2017), report and recommendation adopted, No. 09-20870-CR, 2017 WL 1066779 (S.D. Fla. Mar. 21, 2017) ("It seems clear that an attempted Hobbs Act robbery qualifies as a 'crime of violence' under the 'use of force' clause of 924(c), just as a Hobbs Act robbery does.").

argument that the individual has not yet been sentenced and may serve as a government witness in this prosecution.

The Attorney General and United States Attorneys have "the exclusive authority not only to decide whether to prosecute, but also to decide which of alternative statutory sections, which may carry penalties of varying severity, the defendant will be charged with violating." United States v. Sanchez, 517 F.3d 651, 670 (2d Cir. 2008). "[B]ecause the United States Attorneys are charged with taking care that the laws are faithfully executed, there is a 'presumption of regularity support[ing] their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" Id. (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)). Prosecutorial discretion does have constitutional constraints, however, and "an indictment will be dismissed if the Court makes a finding of 'actual' vindictiveness . . . ." United States v. Johnson, 171 F.3d 139, 140 (2d Cir. 1999).[6] To demonstrate actual vindictiveness, "the defendant must show that '(1) the prosecutor harbored genuine animus toward the defendant,

---

[6] An indictment may also be dismissed if there is a "presumption of vindictiveness that has not been rebutted . . . ." Johnson, 171 F.3d at 140. This presumption does not attach pretrial and thus does not apply here. See United States v. Stewart, 590 F.3d 93, 122 (2d Cir. 2009) (noting that the Second Circuit has "consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting"); see also United States v. Korn, No. 11-CR-384S, 2016 WL 525870, at *2 n.2 (W.D.N.Y. Feb. 10, 2016).

17

or was prevailed upon to bring the charges by another with animus
such that the prosecutor could be considered a 'stalking horse,'
and (2) the defendant would not have been prosecuted except for
the animus.'" United States v. Sanders, 211 F.3d 711, 717 (2d
Cir. 2000) (quoting United States v. Koh, 199 F.3d 632, 640 (2d
Cir. 1999)).

Rucker has failed to allege "clear evidence" of selective or
vindictive prosecution. See Sanchez, 517 F.3d at 671. The mere
fact that a co-conspirator allegedly was prosecuted in a different
manner does not create a federal constitutional violation. See
Oyler v. Boles, 368 U.S. 448, 456 (1962) (holding that "the
conscious exercise of some selectivity in enforcement is not in
itself a federal constitutional violation"). The defendant has
not put forth any evidence suggesting "genuine animus" motivating
the prosecution here. Accordingly, I find no merit to his claim
of vindictive prosecution.

Based on the above, it is my Report and Recommendation that
defendant's motions to dismiss the Indictment as a whole, and
individual counts, be **denied.**

## B. Motion for Grand Jury Disclosures:

Defendant argues that, should dismissal of the Indictment be
denied, he should be entitled to extensive inspection of the grand
jury proceedings, including the instructions given to the grand
jury, log books, names of people who testified before the grand

18

jury, the source of "authorization" of persons in the grand jury room, the length of deliberation, and minutes from the proceedings. Defendant has not provided any specific reasons or facts tending to support his broad requests other than an allegation that there is insufficient legal evidence to support the charges on each individual count of the Indictment. See Docket # 68 at 16-30.

Grand jury proceedings receive a presumption of secrecy and closure. See In re Grand Jury Subpoena, 103 F.3d 234, 239 (2d Cir. 1996). "The burden is on the party seeking disclosure to show a particularized need that outweighs the need for secrecy." Id. Here, the defendant's reasons for seeking disclosure of grand jury information are based on speculation and conjecture - clearly insufficient grounds on which to disturb the presumption of grand jury secrecy. See, e.g., United States v. Gonzalez, No. 06 Cr. 726(WHP), 2008 WL 3914877, at *6 (S.D.N.Y. Aug. 26, 2008) ("a defendant's mere speculation as to what occurred in front of the grand jury does not warrant inspection of the minutes") (internal citation omitted); United States v. Yarborough, No. 06-CR-190(A), 2007 WL 962926, at *13 (W.D.N.Y. Mar. 28, 2007) ("a review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct"). Therefore, it is my Decision and Order that defendant's motion for grand jury disclosures be **denied**.

19

## C. Motion to Suppress Physical Evidence

Defendant moves to suppress physical evidence that was retrieved from his bedroom following his arrest on May 29, 2015. The Court held a suppression hearing on April 5, 2017, at which time the government presented two witnesses, FBI Special Agents Jason Galle and Aaron Allan. See Docket ## 96, 97. Rucker was represented by counsel Bryan Oathout, Esq.

Executing Arrest Warrant for Rucker at 784 Hudson Avenue: On May 29, 2015, Special Agent Jason Galle and other members of the FBI's Buffalo Field Office SWAT team executed an arrest warrant for the defendant. See Hearing Transcript from 4/5/17 hearing ("Tr.") at 8. The warrant permitted the team to search 784 Hudson Avenue, Rochester, New York, in order to effect the arrest of the defendant. Id. According to Galle, there were approximately thirty law enforcement members assisting in this effort to arrest Rucker, including approximately fifteen SWAT team members and fifteen additional support staff. Tr. at 31. Special Agent Christopher Fiorito led the arrest team. Tr. at 29. Agent Galle was assigned to be the "breacher," and testified that he received this assignment a few days prior to the mission. Tr. at 9. Galle was not involved in any pre-surveillance of the home or prior investigation of the defendant, nor was he told about any specific dangers in the house or given a map of the interior of the residence. Tr. at 28, 33, 64. At the hearing, Galle could not

20

recall if he was aware of how many people resided in the home, though he acknowledged that it would have been customary for him to receive such information. Tr. at 37-38. Members of the team were in uniform, which included "a military style fatigue with vests that have placards that say FBI on the front . . . helmets on and eye protection, ear protection." Tr. at 27. Primary members of the SWAT team were visibly armed with a long gun or rifle. Id.

The warrant authorized the arrest to begin at 6:00 a.m. Tr. at 29. On May 29, 2015, at 5:00 a.m., members of the team arrived at the "staging location," a firehouse one to two miles away from 784 Hudson. Tr. at 10, 29-30. The team left for the target house at 6:00 a.m. and arrived by 6:05 a.m. Tr. at 10, 33. Agent Galle testified that it is common to execute a warrant in the morning because "typically people are asleep" and "[i]t affords the safest way to execute the arrest." Tr. at 33. Galle, as the "breacher," and two other agents, were the first to enter the porch of 784 Hudson. The assistant breacher knocked "very loudly" and announced, "FBI, search warrant, come to the door" three times, over the course of thirty to forty-five seconds. Tr. at 11-12. With no answer, Agent Fiorito gave the command via radio to breach the front door. Tr. at 12. The three Agents rammed the door inward, and with the door wide open, Agent Galle "began giving commands to any occupants inside, continued to announce our

21

presence, we're FBI, and instructed anyone inside to come to the door." Tr. at 14. The officers yelled from the porch through the open door, and no officers entered the home. See Tr. at 34 ("We didn't enter the residence until both occupants were removed.").

From Agent Galle's perspective from the porch looking through the front door, there was a front room — the living room — with a couch towards the rear of the room facing the front door. Tr. at · 16-17. Galle testified that he could not see what was behind the couch at ground level, and could also not see the far left of the living room. Tr. at 16. Behind the couch, in the center of the room was a hallway leading back to the kitchen. Tr. at 17. While the officers stood on the porch announcing themselves, an individual, later identified as Louis Perry, emerged into the main room from the left side of Agent Galle's vision, in front of the couch. Tr. at 18, 22, 35; see Govt.'s Ex. ## 1-3 (photographs of front porch and the living room). Galle stated "either he was on the sofa out of my sight to the extreme left side of the sofa; he could have been in that bedroom [to the left]; but also could have been just standing in that area in front of the door." Tr. at 18. Upon seeing Mr. Perry, Galle knew that he was not the defendant. Tr. at 18. Mr. Perry complied with the agents' verbal commands, exited the home, and was placed in handcuffs. Agent Galle testified that there were about four officers on the porch with him, all with their guns drawn, and Galle maintained his focus

22

inside the residence. Tr. at 20, 35. Approximately twenty or thirty seconds later, the defendant, Rucker, emerged from a doorway on the left side of the room, behind the couch. Tr. at 20, 38. Galle testified that Rucker was partially dressed "either in tank top and shorts or a t-shirt or something like that. He wasn't fully clothed." Tr. at 22. Galle saw that Rucker was holding a cell phone in his hand, and told him to place it on the top of the couch. Tr. at 21. Rucker complied, and followed Galle's commands to come to the doorway, where he was placed in handcuffs and brought out to the porch. Id. Galle testified that Rucker was not yet allowed to reenter the home. Tr. at 49. Galle testified that he could not remember if he asked Rucker if there were any other people in the home, but that it would have been customary to ask whether anyone else remained in the home. Tr. at 40-41.

At that point, with two occupants secured and removed from the home, Agent Galle testified that the area was still "a danger area, uncleared space; space that I know that an individual appeared from my left side and I didn't know where he came from and I know an individual appeared from behind the couch." Tr. at 23. No members of the SWAT team remained inside the residence, "we were all still on the porch holding at the threshold," Galle testified. Id. In order to secure the home, other agents were stationed in direct eye sight of all doors and windows of the residence. Tr. at 30, 44. Agent Galle testified that although he

23

had no knowledge that anyone else was in the residence, "in my experience . . . people have lied to me in the past about people being present [in the house] . . . I've found many people hiding in situations that wouldn't come out to the sound of police . . . . Any uncleared space is potentially dangerous." Tr. at 46-47.

After approximately thirty to forty-five seconds, Special Agent Fiorito made the call over the radio[7] "to move into the residence to conduct a security sweep." Id. Approximately ten members of the SWAT team entered the residence, "stepping into rooms, visually clearing them, briefly looking under beds to make sure no one is hiding under a bed, opening a closet." Tr. at 24-25, 42. Agent Galle was the first one across the threshold, but he remained in the living room while other members of the team fanned out to secure the house. Tr. at 24, 50. The team only entered the first floor of the residence, which included four or five rooms. Tr. at 24-25, 65. Agent Galle estimated that the security sweep took between five and ten minutes. Tr. at 25, 65. Thereafter, Rucker was brought back into the residence in handcuffs and was dressed before being placed in a police vehicle. Tr. at 62-63, 66.

In addition, special Agent Aaron Allan testified at the

---

[7] Special Agent Galle testified that Agent Fiorito was not stationed on the porch, but was maintaining "a position of cover where he's aware of what's going on, can see what's going on and help direct assets and move people into positions, give commands." Tr. at 44.

24

suppression hearing. Tr. at 71. Also a member of the SWAT team, Allan was assigned to be an "assaulter," meaning he was "responsible for either taking the suspect into custody or conducting the security sweep of the premises." Id. He was located on the front side of the house, and was not part of the breach team. Tr. at 74. Agent Allan testified that he did not see Mr. Perry brought out of the house, but he did see Rucker brought out and secured, at which time he entered the home to conduct the security sweep. Tr. at 75. He testified that about ten agents entered the home with him to conduct the sweep. Tr. at 76. Agent Allen entered the living room and went through "a door in the back left corner" of the living room with one other agent. Tr. at 77, 94. The room was "fairly small," "probably 10 by 10 or 12 by 12." Tr. at 94-95. "In that bedroom there was an unmade bed, there was a TV – a television on a stand, there was a nightstand, there was also a small closet area/storage area off the bedroom." Tr. at 77-78. The agents did a visual sweep of the room and searched in the closet and under the bed. Tr. at 94. In the room, Allen saw "a bag of a white powdery substance on the television stand or the stand that the television is on; there was a magazine . . . for a pistol in there; as well as some ammunition in the room." Tr. at 79. The ammunition was on a stand next to the bed, and the magazine was by the television. Tr. at 80-83.[8]

---

[8] At this point during Agent Allen's direct examination, the government showed

25

Allen testified that he observed all of this without opening any containers or drawers. Id. The search of the room took "probably a minute or two." Tr. at 94.

Based on the contraband found during the "protective sweep," the government applied for a search warrant for the defendant's bedroom at 784 Hudson Avenue, which the undersigned authorized on May 29, 2015 at 1:54 p.m.[9] See Letter to the Court From Gov't., Dated 11/1/2016 (containing a copy of the search warrant and application, bearing Bate Stamp numbers 101-115). On May 29, 2015, law enforcement executed the search warrant and seized from defendant's room, among other things, a handgun magazine, one round of ammunition, three cellular telephones (and the information therein), suspected cocaine, and documents. These are the items that defendant now moves to suppress. See Docket # 49 at 37-39 (defendant's omnibus motions); Docket # 99 (defendant's post-hearing brief).

Standing:    For the purposes of this motion, defendant submitted a signed affidavit stating that, on May 29, 2015, he

exhibits labeled 4-7, which depict the contraband as found in the bedroom at the time of the search. See Tr. at 78-85. These photos are at issue in the government's motion to reopen the suppression hearing (Docket # 104). See infra.

[9] The warrant was not presented at the suppression hearing and is called "Government's Exhibit # 10" in the government's motion to reopen the suppression hearing (Docket # 104). See infra. However, the warrant has been previously supplied to the Court by letter dated November 1, 2016, and, as indicated in the letter, was part of the discovery given to defendant, Bates Stamped 101-115.

resided at 784 Hudson Avenue, Rochester New York, and was renting a bedroom in that residence from Lewis Perry IV. See Docket # 49-1. Defendant states that he did not consent to the search of his room, nor did he give anyone authority to consent to a search on his behalf. Id. Accordingly, defendant has demonstrated standing to contest the search of his bedroom. See United States v. Baker, No. 07-CR-126A (SR), 2009 WL 6594328, at *1 (W.D.N.Y. Dec. 17, 2009), report and recommendation adopted, No. 07-CR-126A, 2010 WL 2465533 (W.D.N.Y. June 14, 2010) (stating that standing is demonstrated by submission of an affidavit demonstrating a legally cognizable privacy interest in the searched premises).

Discussion: Defendant moves to suppress the physical evidence obtained from his bedroom on the basis that it is the "fruits of the police misconduct in wrongfully entering the premise and conducting a warrantless search in the first place." Docket # 99. The government first responds that plaintiff's cell phone was properly seized incident to his arrest. See Docket # 107 at 4-5. The other items, the government argues, were seen in plain view during a protective sweep of defendant's bedroom incident to his arrest, and thus the search warrant and the seizure of the items were lawful. Id. at 5-7.

Protective Sweep: The protective sweep doctrine was first described by the Supreme Court in Maryland v. Buie, 494 U.S. 325, 327 (1990). When permitted, a "'protective sweep' is a quick and

27

limited search of premises, incident to an arrest, and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person may be hiding." Buie, 494 U.S. at 327. "[T]he sweep must not last longer than necessary to allay the reasonable suspicion of danger and, in any event, not longer than it takes for the officers to finish the work for which they are lawfully on the premises." United States v. Miller, 430 F.3d 93, 100 (2d Cir. 2005). In terms of resolving Rucker's suppression motion, it is important to distinguish the type of protective sweep the government relies on here.

> The Supreme Court in Buie recognized two kinds of protective sweeps. The first may be conducted "as a precautionary matter" and without probable cause or reasonable suspicion, but it must be limited to "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. The second may extend beyond immediately adjoining spaces but must be based upon "articulable facts which ... would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.

United States v. Thomas, 429 F.2d 282, 287 (D.C. Cir. 2005); see United States v. Blue, 78 F.3d 56, 59 (2d Cir. 1996) (holding that any search beyond "spaces immediately adjoining the place of arrest" requires specific and articulable facts demonstrating possible danger to the arresting officers); see also United States v. Sinclair, 2012 WL 5389729, *6 (W.D.N.Y. Nov. 2, 2012) (distinguishing between the different types of protective sweeps

that may be conducted in a residence during the course of an arrest).

Here, only the "precautionary" type of protective sweep provides justification for law enforcement's actions. Indeed, the record pays tribute to the fact that the Agents had no specific and articulable facts upon which the second kind of protective search would be justified. Special Agent Galle testified that he conducts protective sweeps every time he goes into a residence pursuant to a federal arrest warrant. Tr. at 48-49. This is the antithesis of a showing of particularized facts required for a protective sweep based on the possibility of a lurking danger in the residence. United States v. El-Gheur, No. 91 Cr. 328 (LBS), 1991 WL 197559, at *4 (S.D.N.Y. Sept. 24, 1991) ("It must be noted that the police officers' testimony that they routinely perform protective sweeps whenever they make an in-home arrest is troubling. This suggestion that no objective level of suspicion is required for a sweep was rejected expressly in Buie.") (internal citations omitted); see United States v. Gandia, 424 F.3d 255, 260-61 (2d Cir. 2005) (rejecting protective sweep where officer had no specific and articulable facts that there were "unknown third-parties hiding" in suspects apartment); United States v. Juarbe, No. 11-CR-151A, 2015 WL 3853032, at *13 (W.D.N.Y. Apr. 23, 2015), report and recommendation adopted sub nom. United States v. Hidalgo, 2015 WL 3853071 (W.D.N.Y. June 17, 2015) (agents lacked

reasonable belief that anyone would be inside apartment that could pose a danger to law enforcement).

However, the "precautionary" type of protective sweep authorized by Buie is automatically justified by the arrest itself and requires no specific probable cause or reasonable suspicion finding. Buie, 494 U.S. at 334. "[I]ncident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. (emphasis added). The critical issue in precautionary protective sweeps often becomes whether the place where the contraband was found qualifies as a "space immediately adjoining the place of arrest." E.g., United States v. Lucas, 817 F. Supp. 2d 151, 163 (W.D.N.Y. 2010), aff'd, 462 F. App'x 48 (2d Cir. 2012). Here, it does as well. The suppression hearing record confirms that Agent Galle first located Rucker standing in the living room of 784 Hudson Avenue partially clothed and holding his cell phone. Rucker was directed to place the phone down, put his hands up, and walk toward the threshold of the home. He complied. Within a minute of Rucker being handcuffed, a command was given to conduct a protective sweep of the home. Tr. at 42. Hearing testimony and photographs introduced at the hearing confirm that there is a small bedroom that can be accessed directly from the living room where Rucker was first

observed. See Hearing Exhibit 3. There simply is no basis for the Court to find that the bedroom in which contraband was located during the protective sweep was not immediately adjoining the place of Rucker's arrest. See United States v. Clarke, 133 F.3d 908 (2d Cir. 1997)(holding that because "undisputed evidence indicates that bedroom was a space immediately adjoining the place of arrest," protective sweep of bedroom was justified); United States v. Alejandro, 100 F. App'x 846, 848 (2d Cir. 2004)("Particularly when a district court finds that an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception."); Lucas, 817 F. Supp. 2d at 163 (W.D.N.Y. 2010) (holding that protective was search proper where bedroom, where shotgun shells found, was in a space adjoining the area where defendant was taken into custody); United States v. Chervin, No. 10 CR 918 RPP, 2011 WL 4373928, at *4 (S.D.N.Y. Sept. 20, 2011)("[C]ourts have held that arrests made in hallways with adjacent bedroom entrances are subject to the Buie 'immediately adjoining' protective sweep."); see also United States v. Sinclair, No. 10-CR-6211L, 2012 WL 5389729, at *6-*7 (W.D.N.Y. Nov. 2, 2012), report and recommendation adopted, No. 10-CR-6211-FPG, 2013 WL 6154409 (W.D.N.Y. Nov. 22, 2013) (collecting cases). For these reasons, the Court finds that the agents were entitled to conduct a precautionary protective sweep and enter the bedroom that adjoins the living room where Rucker was first encountered.

31

Plain View: Having determined that the agents had the right to enter the first floor bedroom, the Court turns to whether the seizure of the items in the bedroom was justified. "[W]hen law enforcement officers have lawfully entered premises in connection with an arrest, and in the course of making a permissible quick and limited protective sweep of the premises they see an object whose incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) (internal quotations and citation omitted). Agent Allen testified that Rucker's room was "fairly small," "probably 10 by 10 or 12 by 12." Tr. at 94-95. The bag "of white powdery substance," firearm magazine, and ammunition, the subject of the suppression motion, were all found on top of surfaces in the room, easily seen by Allen during a "visual sweep." Tr. at 79, 80-83, 94. Allen did not open any containers or drawers. Allen did not seize the items at that time, but the government used the plain-view observations to apply for a search warrant of Rucker's bedroom, and one vehicle. The undersigned authorized that search on May 9, 2015 at 1:54 p.m. See Letter from Gov't, Nov. 1, 2016 (attaching a copy of the search warrant and application for Case No. 15-mj-604). Rucker does not contest the sufficiency of the warrant.

Because the Court finds that the officers permissibly entered

the defendant's room, saw the items at issue in plain view,[10] and then seized the items pursuant to a valid search warrant, it is my Report and Recommendation that defendant's motion to suppress physical evidence be **denied.**

Motion to Reopen Suppression Hearing: As part of its presentation of evidence during defendant's hearing to suppress physical evidence on April 5, 2017, the government marked and used a number of exhibits. Some were moved into evidence for the purpose of the hearings; others were marked but were never moved into evidence. After the government rested, defendant stated that he had no witnesses and rested. The government then asked to reopen the hearing, to which defendant objected, and the Court denied the request. Tr. at 99-103. The government then filed a motion on July 17, 2017 — nearly a month after defendant had filed a post-hearing brief laying out his arguments in support of suppressing the evidence seized at 784 Hudson (Docket # 99) — asking that the Court reopen the suppression hearing to allow the addition of various documents to the record. See Docket # 104. The evidence includes the arrest warrant signed by this Court

_____

[10] Rucker's cell phone was also in "plain view" as it was placed on top of the couch in the living room pursuant to the order of Agent Galle when he first encountered the defendant. The government also argues that the phone was properly seized incident to a lawful arrest. See Docket #107 at p. 4. The Court need not address this argument as I find that the cell phone was later seized pursuant to a warrant I signed after the defendant's arrest. Rucker does not advance any arguments regarding the legality of the warrant, other than it was based on illegally obtained evidence and thus any items seized constitute the "fruit" of a Fourth Amendment violation.

33

authorizing defendant's arrest at 784 Hudson; the search warrant, also signed by this Court, authorizing the search of 784 Hudson following Rucker's arrest; the transcript of the Court's hearing on defendant's motion to suppress statements, held on November 18, 2016; and three photographs depicting images taken of the contraband found in defendant's room pursuant to the "protective sweep." Id. The government affirmed that the failure to properly move the documents into evidence was an "unintentional oversight," and was not "a deliberate strategy to proceed in a piecemeal fashion or otherwise waste judicial resources." Id. at 5. Defendant opposed the government's motion as a violation of due process. See Docket # 108. The government replied. See Docket # 109. On September 18, 2017, the Court held a hearing with both parties and reserved decision. See Docket # 112. The Court has now issued a Report and Recommendation that Rucker's motion to suppress physical evidence be denied. See supra. Because this Recommendation has been made without reliance on the items of evidence at issue in the Government's motion to reopen (Docket # 104), that motion is now **denied as moot**.

## D. Motion to Suppress Statements

Defendant also seeks to suppress statements that he made during and after his arrest. The Court held a suppression hearing on November 18, 2016. See Docket ## 75, 78. The government presented two witnesses, Rochester Police Officer Evan Lang and

New York State Police Officer Andrew Jasie. The defendant represented himself, pro se, and testified on his own behalf.

Testimony of Officer Lang: Officer Evan Lang is a patrol officer with the Rochester Police Department ("RPD"). Transcript from May 26, 2015 hearing ("Tr.") (Docket # 78) at 11-12. On the morning of May 29, 2015, Lang was assigned to assist the SWAT team in executing the arrest warrant at 784 Hudson Avenue. Tr. at 12. Lang was assigned to a "perimeter point" on a street adjacent to Hudson, where he waited in his patrol car and uniform. Tr. at 12-13. His role was to "make sure nobody exits the target location and gets through our perimeter point that exits the location." Tr. at 13. He was alone in the vehicle. Tr. at 15.

At approximately 7:05 a.m., Officer Lang's supervisor, Sergeant Flamur Zenelovic, radio contacted Lang to move his patrol vehicle to 784 Hudson. Tr. at 14-15. When Lang arrived, the defendant was placed in the back seat of the patrol car. Tr. at 16. Rucker was in handcuffs. Id. According to Lang, Zenelovic gave him instructions to "sit tight and wait." Id. Lang testified that defendant asked him, "what's going on?" and Lang replied "I have no idea." Tr. at 24-25. Lang thereafter received instructions to transport the defendant to the FBI building on Scottsville Road. Tr. at 17. He arrived at the FBI office at approximately 7:30 a.m., and after a brief waiting period, FBI Agents came outside and Lang escorted Rucker into the FBI office.

Tr. at 19. The officers exchanged handcuffs on Rucker, and Lang left. Id. Lang testified that he did not ask Rucker any questions and had no conversation with Rucker. Tr. at 19-20. Lang wrote no report on this incident, stating that he was instructed not to do so, which can be standard procedure when dealing with other jurisdictions. Tr. at 25. On cross examination, Officer Lang repeated that he had no other conversation with the defendant, and specifically asserted that the defendant never asked for an attorney or any type of legal representation. Tr. at 39-40.

Testimony of Investigator Jasie: New York State Police Investigator Andrew Jasie also testified for the government. Tr. at 43-92. Investigator Jasie was assigned to a perimeter post. Tr. at 44-45. His role was "to secure the area and approach the residence after SWAT had established control and advised that it was clear." Tr. at 45. Jasie was involved in the investigation leading up to the arrest, which included two and a half weeks of surveillance of 784 Hudson. Tr. at 46. Investigator Jasie identified FBI Agent Bastian Freund as the head of the investigation. Tr. at 46-47.

Jasie testified that, on May 29, 2015, he first encountered the defendant after Rucker was secured in handcuffs and was being given clothes to wear for transport. Tr. at 48. Rucker was in the living room of 784 Hudson, and Jasie testified that Agent Freund told Rucker that there was an indictment warrant for his

36

arrest and that he was going to be transported to the FBI office. Tr. at 52. Agent Freund then took Rucker outside, and Investigator Jasie stated that he saw Rucker in the back of an RPD vehicle. Tr. at 49. Jasie and Freund thereafter traveled in separate vehicles to the FBI building on Scottsville Road. Tr. at 50-51. When Jasie arrived, Rucker was in an interview room, seated and handcuffed to a bar on the wall. Id. Jasie and Freund interviewed Rucker, and the interview was video and audio recorded. See Gov't Ex. 2.

The Court has reviewed the video recording in its entirety. The video includes a date and time stamp, and shows Rucker being brought into the interview room at 7:34 and handcuffed to a bar on the wall. At 7:42 Agent Freund and Investigator Jasie came in, closed the door, and began the interview. They introduced themselves to Rucker, and Freund asked preliminary questions including the defendant's name and social security number. The agents then asked Rucker if was under the influence of drugs or alcohol and the defendant said no. Freund eventually told Rucker that he was under arrest pursuant to an arrest warrant, and that he was not free to leave. Rucker responded that he did not understand the reason for his arrest. Freund responded "I will get to that," and then read Rucker his Miranda rights from a form. Asked if he understood those rights, Rucker again responded "not really . . . I'm still lost on why I'm here though." Freund again

asked if Rucker understood his rights. Rucker responded that he did not know. Freund then told Rucker that he could not further explain what was going on until Rucker understood his rights. Freund asked if Rucker understood what rights were, and if Rucker would like to talk to him. Rucker answered that he would like to speak to him, but wondered if they could speak without Rucker signing the form. Freund then said "do you understand your rights?" and Rucker says "I guess so." Then Freund again said, "I just want to make sure that you understand that you don't have to talk to us." Rucker nodded his head affirmatively and said "mmhm." Freund then began the interview. Agent Freund and Investigator Jasie interviewed Rucker for approximately half an hour. The interview concluded at 8:15, and the video runs until 8:46, at which time Rucker was removed from the interview room. The video confirmed that Rocker was never threatened, coerced or subjected to improper interrogation techniques. In sum, Investigator Jasie's testimony at the suppression hearing was consistent with what the Court viewed on the video. Tr. at 56, 58.

Defendant's Testimony: The government rested at the conclusion of Investigator Jasie's testimony. The defendant then testified on his own behalf.[11] Rucker testified that after he was

---

[11] Prior to the defendant's testimony, counsel for the government stipulated that the testimony — insofar as it related to defendant's assertion that his Fifth Amendment right to counsel was violated — will not be used in the government's case in chief at trial, pursuant to Simmons v. United States, 390 U.S. 377 (1968). See Tr. at 94-97.

38

arrested and provided a change of clothes, he was placed in a
patrol vehicle. Tr. at 98. While he was sitting in the backseat,
the officer asked him "a bunch of preliminary questions pertaining
to age, name, date of birth," and Rucker asked, "am I going to be
provided with a lawyer?" Tr. at 100. According to Rucker, the
officer responded, "I don't know . . . I'm just here to transport
you." Id.

Discussion: Based on the hearing testimony and the video,
the Court concludes that the defendant's Miranda rights were not
violated in the course of his arrest and subsequent interview.
The defendant was not intoxicated, intimidated or coerced. The
video clearly shows that, once in the investigation room at the
FBI building, Rucker was read his Miranda rights from a form. Agent
Freund repeatedly explained the Miranda rights in an effort to
obtain a waiver from Rucker. Rucker eventually acknowledged that
he understood his rights and that he wished to speak further with
the officers. Although Rucker refused to sign the waiver form, it
is clear from his actions and his language that he understood his
rights and thereafter knowingly and voluntarily waived those
rights. See Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)
("Where the prosecution shows that a Miranda warning was given and
that it was understood by the accused, an accused's uncoerced
statement establishes an implied waiver of the right to remain
silent."); United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011)

39

(finding defendant waived rights to remain silent and consult with counsel "both expressly and through a course of conduct indicating waiver"); United States v. Tutino, 883 F.2d 1125, 1138 (2d Cir. 1989) (internal quotations omitted) (finding defendant who nodded his head and answered "yes" when asked if he understood his rights prior to his confession had waived his Miranda rights); United States v. Bailey, No. 15-CR-6082G, 2016 WL 6995067, at *35 (W.D.N.Y. Nov. 29, 2016) (refusal to sign the rights card does not preclude a finding of a valid waiver) (citing cases); United States v. Williams, No. 16-CR-6014W, 2016 WL 6311805, at *6 (W.D.N.Y. Oct. 26, 2016), report and recommendation adopted, No. 6:16-CR-06014 EAW, 2016 WL 6952307 (W.D.N.Y. Nov. 28, 2016) (finding waiver where defendant nodded head and said "um-hum" in response to whether he understood his rights); see also Barnes v. Johnson, 160 F.3d 218, 225 (5th Cir. 1998) (where defendant said "no" when asked if he wished to waive his right to remain silent, officers did not violate the fifth amendment by asking clarifying questions which revealed that defendant did not understand the term "waive").

The officers' interactions with the defendant before his arrival at the Scottsville Road building do not suggest misconduct either. While in the backseat of Officer Lang's vehicle, Rucker was clearly under arrest, and had not yet been read his Miranda rights. Officer Lang denied asking the defendant any questions while they waited outside of 784 Hudson or during transport to

40

Scottsville Road. The Court finds no reason to discredit that testimony. To the extent, however, that the officer did request plaintiff's age, name, or birthdate, these inquiries seek "pedigree information" which does not amount to "unlawful custodial interrogation." See United States v. Carmona, 873 F.2d 569, 573 (2d Cir. 1989) (discussing United States v. Gotchis, 803 F.2d 74 (2d Cir. 1986) and United States ex rel. Hines v. Lavalle, 521 F.2d 1109 (2d Cir. 1975)). The Court agrees with the defendant that any more intrusive questioning obtained during the car ride with Officer Lang would be inadmissible at trial, but no party has suggested that any such statements were made.

Rucker's alleged statement to Officer Lang asking, "am I going to get a lawyer," does not change the Court's analysis. Law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. Edward v. Arizona, 451 U.S. 477, 485 (1981). The invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be constructed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of

questioning." Davis v. United States, 512 U.S. 452, 459 (1994)
(emphasis in original). Instead, "the suspect must unambiguously
request counsel." Id. (holding that the statement, "maybe I
should talk to a lawyer," is not a request for counsel); see also
Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir. 1996) (finding that the
defendant "did not effectively assert his right to counsel" where
he stated "I think I want a lawyer" and "do you think I need a
lawyer?" to the police). Thus, assuming that Rucker did ask the
transporting officer, "am I going to get a lawyer?", such an
inquiry was not a clear assertion of his Fifth Amendment right to
counsel. See United States v. Willson, 15-CR-142-EAW-MJR, 2017 WL
1133419, at *3-*4 (W.D.N.Y. Feb. 27, 2017) (defendant's statement
"maybe I should get a lawyer. Let's see what you got to say," was
not a clear request for counsel). His statement was not an
unequivocal request for counsel, and once at the FBI building,
Rucker did not repeat this question or otherwise mention needing
or wanting counsel. Thus, there was no Miranda violation. See
Burghuis v. Thompkins, 560 U.S. at 381 (police are not required to
ask clarifying questions as to whether the accused wants to invoke
Miranda rights).

        For all of these reasons, it is my Report and Recommendation
that defendant's motion to suppress statements made to Agent Freund
and Officer Jasie on the day of his arrest be **denied.**

                                    42

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to dismiss the Indictment and individual counts be **denied.** It is my Decision and Order that defendant's motion for grand jury disclosures be **denied.** It is my Report and Recommendation that defendant's motion to suppress physical evidence be denied. It is my Decision and Order that the government's motion to reopen the record related to suppression of physical evidence be **denied.** And lastly, it is my Report and Recommendation that defendant's motion to suppress statements be **denied.**

      **SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    November 20, 2017
            Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby
**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on <u>de novo</u> review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. <u>See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.,</u> 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      November 20, 2017
            Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1103 (1992); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).